UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

LEVI ANDERS,                          )
                                      )
            Petitioner,               )
                                      )
      v.                              )       Case No. 1:23-cv-00044-SNLJ
                                      )
UNITED STATES OF AMERICA,             )
                                      )
            Respondent.               )

**MEMORANDUM AND ORDER**

On March 31, 2023, Petitioner Levi Anders ("Anders") filed this Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States Code, Section 2255. This Court then ordered the United States to show cause why the relief requested in Anders's motion should not be granted.  Based on the reasons set forth below, this Court will dismiss Anders's claims as waived and procedurally barred or otherwise deny them without an evidentiary hearing because they fail as a matter of law.

**I.    PROCEDURAL HISTORY**

Anders was charged and convicted in two related cases: *United States v. Anders,* 1:18-cr-00073-SNLJ ("First Case") and *United States v. Anders,* 1:19-cr-00044-SNLJ ("Second Case"), but this Motion to Vacate only seeks to vacate the conviction in the Second Case.

On February 14, 2018, SEMO Drug Task Force Officers ("TFOs") utilized a confidential informant ("CI") to purchase approximately one-half ounce of methamphetamine from Levi Anders at a residence in Dexter, Missouri.  First Case,

Doc. 30 ("Guilty Plea"). Officers conducted surveillance of the transaction, recovered the methamphetamine from the CI and then conducted a traffic stop on Anders. *Id.* Anders was arrested, and the buy money was recovered from his vehicle. *Id.* Anders was advised of his Miranda rights, indicated that he understood them, and agreed to speak with the investigators. *Id.* Anders told officers that he had obtained eight ounces from his supplier and that he owed the supplier $2,000.00 for a previous drug debt. *Id.* at 2-3.

Anders was charged in the Southeastern Division of the Eastern District of Missouri on June 12, 2018, in a one-count indictment with distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(l). First Case, Doc. 1. Anders pleaded guilty as charged on September 4, 2018, and was allowed to remain out on bond pending sentencing. First Case, Doc. 29.

On January 9, 2019, prior to sentencing in the first case, the police received information that Anders was still involved with distributing methamphetamine. Second Case, Doc. 85 ("PSR"), ¶ 23. Officers utilized a different CI to conduct a controlled delivery of methamphetamine to Anders. *Id.* The CI and Anders communicated via Facebook, and Anders informed the CI that he wanted "28," referring to 28 grams of methamphetamine. *Id.* Anders and the CI agreed to meet on January 11, 2019, at a Menards store in Poplar Bluff, Missouri, for the exchange. *Id.* Officers obtained 34 grams of a substance that had the appearance of methamphetamine to use during the controlled delivery. *Id.*

The CI arrived at the meeting location, and a short time later Anders arrived. *Id.*

2

at ¶ 24.  Officers observed the CI exit his vehicle with a Styrofoam cup in hand.  *Id.*
Officers had previously placed the bag of simulated methamphetamine inside of a
Ziploc bag and placed the bag into the cup.  *Id.*  The CI entered Anders's vehicle, and
a short time later the CI exited the vehicle without the cup. *Id.* At that time, Anders
drove away from the area, and officers conducted a stop of his vehicle. Officers
directed Anders to exit the vehicle, to which he complied.  *Id.*  Upon searching
Anders's vehicle, officers observed the cup they previously provided to the CI;
however, the cup was empty.  *Id.*  The empty Ziploc bag was located on the front
passenger floorboard.  *Id.*  Officers located the bag of simulated methamphetamine in
Anders's right sock.  *Id.*  Upon being interviewed by law enforcement officers,
Anders admitted to obtaining three ounces of methamphetamine from the CI over the
three prior months.  *Id.* at ¶ 25.

Anders was charged in one-count indictment with attempting to possess with
intent to distribute methamphetamine in violation of 21 U.S.C. § 84l(a)(l).  Second
Case, Doc. 1.

Anders chose to stand trial by jury which commenced on September 26,
2019.  Second Case, Doc. 41.  Various officers who were involved in the
investigation testified that the informant was given the simulated methamphetamine
in a Styrofoam cup, met with Anders in his car and then left without the cup.
Second Case, Doc. 100 ("Trial Tr.") at 77 (Detective Morgan), 134-135 (Detective
Mitchell).  Video of that was shown to the jury.  Trial Ex. 4; Trial Tr. at 80.

The CI testified, describing the transaction with Anders included getting the
cup containing the simulated methamphetamine and leaving it in Anders's car.

Trial Tr. at 103-106.  The CI testified that the video taken inside the vehicle primarily showed the dashboard, windshield, and roof, as opposed to the actual transaction.  Trial Tr.at 106.  The video was admitted, and the jury watched the transaction.  Trial Ex. 8; Trial Tr. at 108.  The CI also testified that he had sold Anders one-ounce quantities of methamphetamine "probably upward of thirty times."  Trial Tr. at 103.

The officers also testified about the traffic stop of Anders and the discovery of the simulated methamphetamine in his right sock.  Trial Tr.at 61-62 (Patrolman Sample), 78 (Detective Morgan), 139 (Detective Mitchell).  The jury watched video of the stop, search of Anders's person, and seizure of the simulated methamphetamine.  Trial Ex. 1; Trial Tr. at 62 (Patrolman Sample), at 80 (Detective Morgan), at 139-140 (Detective Mitchell).  The jury also saw one still photograph of the lump in Anders's sock caused by his attempt to conceal the simulated methamphetamine.  Trial Ex. 11; TRS Trial, at 143 (Detective Mitchell).  The jurors heard about and watched Anders's interview where he admitted to obtaining three ounces from the informant over the past three months.  Trial Ex. 13; TRS Trial, at 145 (Detective Mitchell).

Pursuant to Rule 404(b), the jurors heard evidence that Anders had pleaded guilty to distribution of methamphetamine in federal court and distributing crack cocaine in state court.  Trial Ex. 2; Trial Ex. 3; Trial Tr. at 71-73 (Detective Morgan).

4

Anders testified on his own behalf, indicating that he had known the CI for a "couple of years" and that they were friends before they started conducting drug deals together. Trial Tr. at 160. Anders also testified that his meeting with the CI on January 11, 2019, had nothing to do with drugs, and that Anders had borrowed money from the CI after he had been released in the first case on bail and merely wished to pay it back. *Id.* at 160-161.

Anders also testified that he had not purchased methamphetamine from the informant since he was released on bond and had only gotten marijuana from him "a few times" since. *Id.* at 161. Anders also admitted that around January 11, 2019, he had been trying to buy an ounce of marijuana from the CI for his cousin, who was an over-the-road truck driver. *Id.* at 161-162. Anders stated that the CI had entered his vehicle, and Anders had paid him $150 of what he was owed for the loan. *Id.* at 164. While in the car, the CI had pretended to drink from the cup, which the CI left in Anders's vehicle. *Id*. at 164. Anders then drove away and was pulled over by the police. *Id*. at 165-166.

Anders testified that the officers pointed guns at him, which made him nervous, and being nervous always made his throat dry. *Id*. at 166. Anders said that he then grabbed his friend's used cup and took the lid off to obtain a drink but realized that there was a plastic bag containing the simulated methamphetamine inside. *Id*. Anders testified that at this point he panicked and stuffed it in his sock. *Id*. Concerning the interview, Anders testified that he was only referring to marijuana

deals when he told the officer that he had gotten methamphetamine from the CI over the past few months. *Id.* at 167-168. The jury rejected Anders's version of the story and found him guilty after a one-day trial. Second Case, Doc. 46.

A presentence investigation report was prepared, which determined that Anders's base offense level was 30. PSR, ¶ 33. Two levels were added pursuant to Section 3C1.1 for obstructing justice as Anders provided false testimony during his trial. *Id.* at ¶ 37. Three more levels were added pursuant to the statutory enhancement for committing an offense while on release under Section 3C1.1. *Id.* at ¶ 38. Anders did not receive any credit for acceptance of responsibility. *Id.* at ¶ 41. The total offense level was determined to be 35. *Id.* at ¶ 42.

Anders's countable criminal history consisted of a 2007 conviction for distribution of a controlled substance for which he was sentenced to six years in the Missouri DOC, *Id.* at ¶ 48, and a 2009 conviction for possession of a controlled substance for which he also received a six- year sentence, *Id.* at ¶ 51. With a total offense level of 35 and a criminal history category of III, the advisory Sentencing Guidelines range was 210-262 months. *Id.* at ¶ 84.

Prior to the imposition of sentence, Anders complained of trial counsel's performance in not showing another portion of the CI video, portions of which were admitted as Trial Exhibit 8—the very claim raised in Ground III of the Motion to Vacate. Second Case, Doc. 82 ("Sent. Tr. I"), pp. 18-19. Due to the complaint of ineffective assistance, the sentencing hearing was continued, and the Court appointed new counsel. *Id.* at 21-22. Sentencing counsel adopted the objections and

6

sentencing memorandum filed by trial counsel, and the court overruled the objections. Second Case, Doc. 101 ("Sent. Tr. II"), at 5.

The Court also addressed Anders's complaint about trial counsel's performance after Assistant Public Defender Michael Skrien testified. He testified that he had carefully reviewed the videos before trial. *Id.* at 17. Attorney Skrien testified that before trial, Anders only requested that the jury be shown video of his interview with police where he denied responsibility and stated he "did not know what was happening." *Id.* at 19. Attorney Skrien testified that he "didn't see any reason to show that part." *Id.* at 19-20. Attorney Skrien testified that the interview video was "the only issue that we had about what he thought should be shown," and he did not remember Anders asking about the CI video. *Id.* Turning to the video presently complained about in the Motion to Vacate, neither the CI nor Anders was visible, and the transaction could not be seen. *Id.* at 17. Attorney Skrien also testified that he had discussed that with Anders. *Id.* at 17. The reason that Attorney Skrien gave for not showing the video was because it simply did not show anything. *Id.* at 23. While not recalling specifics, Attorney Skrien testified that he would normally have cross-examined the CI on why the conversation between the CI and Anders was not more explicitly drug-related. *Id.* at 24.

After hearing evidence, the Court found as follows:

Okay. Well, first of all, it is absolutely clear to the Court that this was nothing but a strategic decision by defense counsel not to show any more of the video, which would have shown nothing more than what was produced.

7

> Not only that, there is absolutely no prejudice because of this. And there was all sorts of other evidence that came out in this trial that showed that the -- the evidence against the Defendant was overwhelming, and this particular strategic call not to show any more of the video inside the car because it was -- didn't show anything more that it's just -- for one thing it's not even relevant it seems to the Court. And, in any event, there's absolutely no prejudice . . .
>
> And I make express findings about there is -- about the performance of Mr. Skrien, and there's absolutely no ineffective assistance of counsel on this point.

Sent. Tr. II, p. 25.

Anders was sentenced to an aggregate term of 144 months: 120 months in the First Case, consecutive to 24 months in the Second Case. Sent. Tr. II, p. 32.

Anders's sentencing counsel filed an *Anders* Brief, and Anders filed a pro se brief arguing that the Controlled Substances Act was not a valid exercise of Congress's power under the Commerce Clause, and the Court of Appeals affirmed the conviction. *United States v. Anders,* No. 20-2866, 2022 WL 570094 (8th Cir. Feb. 25, 2023). Anders then filed this Motion to Vacate under Section 2255 herein.

## II.   LEGAL STANDARD

"Section 2255 was intended to afford federal prisoners a remedy identical in scope to Federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (quotation omitted). And like habeas corpus, this statutory remedy "does not encompass all claimed errors in conviction and sentencing." *Id*. (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Under 28 U.S.C. § 2255(a), a petitioner may file a motion for post-conviction review on four specified grounds: "(1) 'that the sentence was

8

imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) 'that the sentence is otherwise subject to collateral attack.'" *Martin v. United States*, 150 F. Supp. 3d 1047, 1049 (W.D. Mo. 2015) (quoting *Hill v. United States*, 368 U.S. 424, 426-27 (1962)). The petitioner bears the burden of proof as to each asserted ground for relief. *Golinveaux v. United States*, 915 F.3d 564, 567 (8th Cir. 2019) (citation omitted).

A. **Ineffective Assistance of Counsel**

"A defendant faces a heavy burden to establish ineffective assistance of counsel pursuant to section 2255." *DeRoo v. United States,* 223 F.3d 919, 925 (8th Cir. 2000) (quotation omitted). Ineffective-assistance claims are governed by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). "This standard requires [a petitioner] to show that his trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense." *Nave v. Delo,* 62 F.3d 1024, 1035 (8th Cir. 1995) (quotation omitted). "Failure to satisfy either of [the performance or the prejudice] prongs is fatal to the claim." *Cole v. Roper,* 579 F. Supp. 2d 1246, 1263 (E.D. Mo. 2008) (citation omitted). Indeed, "[i]f the petitioner makes an insufficient showing on one component, the court need not address both components." *Kingsberry v. United States,* 202 F.3d 1030, 1032 (8th Cir. 2000).

Under the performance prong, courts "apply an objective standard [to]

9

determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Nave,* 62 F.3d at 1035 (quotation omitted). In doing so, a court must be careful to "avoid the distorting effects of hindsight and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." *Rodela-Aguilar v. United States,* 596 F.3d 457, 461 (8th Cir. 2010) (citation omitted). The starting point for this analysis is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citation omitted). Counsel's strategic decisions "made after thorough investigation of law and facts . . . are virtually unchallengeable," even if those decisions prove unwise. *Strickland,* 466 U.S. at 690.

Under the prejudice prong, the petitioner must show "a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different." *Nave,* 62 F.3d at 1035 (quotation omitted). This inquiry depends on the likelihood of success if the alleged error were corrected. *Hill,* 474 U.S. at 59. "[I]f there is no reasonable probability that the motion would have been successful, [the petitioner] cannot prove prejudice." *DeRoo,* 223 F.3d at 925.

**B.  <u>Need for an Evidentiary Hearing</u>**

"A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless 'the motion and the files and the records of the case conclusively show that [he] is entitled to no relief.'" *Anjulo–Lopez v. United States*, 541 F.3d 814, 817 (8th

10

Cir. 2008) (alteration in original) (quoting 28 U.S.C. § 2255). "No hearing is required, however, where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Id*. (quotation omitted). For instance, "[a] district court need not hold an evidentiary hearing if the facts alleged, taken as true, would not justify relief." *Larson v. United States,* 905 F.2d 218, 220-21 (8th Cir. 1990) (citation omitted). Moreover, in conducting this inquiry, courts may not give weight to "conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." *Simmons v. United States,* No. l:16-cv-00101 SNLJ, 2016 WL 5941929 (E.D. Mo. Oct. 13, 2016) (citation omitted); *see also Ford v. United States,* 917 F.3d 1015, 1026 (8th Cir. 2019) (reaffirming long-standing rule of dismissing allegations that "are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."). In the ineffective-assistance context, a court "must consider the validity of a petitioner's allegation of ineffective assistance of counsel" in light of the record to determine whether an evidentiary hearing is necessary. *Holder,* 721 F.3d at 994 (quotation and internal alterations omitted); *Blankenship v. United States,* 159 F.3d 336, 337 (8th Cir. 1998).

28 U.S.C. § 2255 provides, in pertinent part, "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon . . . ." Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Court states that,

"If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . ."

When a petition is brought under § 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing.  In determining whether petitioner is entitled to an evidentiary hearing, "the court must take many of petitioner's factual averments as true, but the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." *United States v. McGill,* 11 F.3d 223, 225 (1st Cir. 1993).  A hearing is unnecessary when a § 2255 motion "is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007), citing *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir.1994).

## III.    DISCUSSION

### A.    <u>Trial counsel's performance was neither defective nor caused Anders any prejudice.</u>

Anders's first ground for relief is his claim that he received ineffective assistance of counsel in that his attorney: 1) failed to investigate mitigating evidence; 2) failed to properly prepare for trial; 3) did not view the surveillance video with him; and 4) failed to discuss trial strategy with him.  Doc. 1 at 13-14.  Anders's claims in this ground are either totally unsupported or are contradicted by the record.

Anders fails to identify what mitigating evidence his attorney should have

uncovered, or how that would have changed the outcome of the trial.  Typically, mitigation evidence, relating to things like a defendant's life circumstances, family or prior good conduct is not admissible at trial, where the issues are limited to the elements of the crime charged.  The record reflects that Anders's trial counsel did put mitigating evidence before the Court at sentencing by way of his sentencing memo, as evidenced by the Court's comments at sentencing, indicating that the sentencing memo "makes some very powerful points in Mr. Anders' favor here."  Sent. Tr. II at 27.  Those points were effective as well, given that the Court granted a downward variance from the advisory Sentencing Guidelines range of 210-262 months to an aggregate sentence of 144 months.  *Id.* at 32.

In terms of trial preparation, Anders states that he was prejudiced by his trial counsel's failure to

> . . . investigate mitigating evidence and properly prepare for trial. Counsel spent at the most two hours in the aggregate with Movant prior to trial.  Counsel did not view the surveillance video with the Movant and failed to discuss a defense strategy with Movant. Counsel did not even discuss Movant's testimony prior to trial.

Doc. 1 at 13-14.

Anders's claim that trial counsel "spent at the most two hours" with him prior to trial is simply not supported by the record.  The record clearly reflects that trial counsel was familiar with the issues and evidence, effectively cross-examined the government witnesses, and helped Anders tell his side of the story.  Trial counsel gave a scathing closing directed at the CI and reinforcing Anders's view that he did

13

not go there to do a drug deal but was set up by the CI and the police.  Trial Tr. at 209-213.

Anders's real problem is not that counsel was deficient in his performance, but that the jury did not believe his denials, his patently incredible explanation for how the simulated drugs got in his sock, or his explanation that he was not talking about recent methamphetamine deals during his confession.

Trial counsel testified about some of these issues at sentencing because Anders was already making allegations about his performance.  That testimony clearly reflects that counsel was very diligent in his preparations for trial.  In terms of strategy, it is well established that matters of trial strategy are generally entrusted to the professional discretion of counsel and are "virtually unchallengeable" in § 2255 proceedings.  *Loefer v. United States*, 604 F.3d 1028, 1030 (8th Cir. 2010).

Counsel testified that prior to trial he had reviewed all the discovery information including the audio and video recordings.  Sent. Tr. II at 16.  Anders had access to the videos and was able to watch them.  *Id*. at 20.  Counsel discussed the nature of the video and any evidentiary value that it might have had with Anders.  *Id*. at 18.  Counsel also discussed with Anders the possibility of playing only the relevant portions of the CI video and trial and indicated that Anders did not want the whole of the CI videos shown.  *Id*. at 19.

Trial counsel reinforces the record in this respect in an affidavit which was prepared to address these claims:

14

Anders indicates he spent only two hours or less with his counsel before trial. Undersigned counsel states this is simply inaccurate. In fact, Mr. Anders testified at trial and undersigned counsel would have likely spent at least one to two hours on that subject alone, preparing Mr. Anders for his direct examination as well as his cross examination. It is possible that time was not all at once, but undersigned counsel unequivocally states he spent several hours discussing the case with Mr. Anders, including discussions about testifying, as well as general trial strategy. Additionally, counsel was quite familiar with the evidence.

Doc. 10, Exhibit A, ¶ 6.

Thus, the record reflects that trial counsel was not deficient in his representation of Anders, and Anders was not prejudiced by his counsel's performance.

## B. **Counsel was not ineffective in how he phrased questions about Anders and the CI meeting each other in the context of drug dealing.**

In his second ground for relief, Anders claims that his counsel was ineffective in referring to his relationship with the CI as being drug related, as opposed to being social in nature. Doc. 1 at 14. Anders believes that this comment prejudiced him before the jury because it undermined his defense that he met the CI on the day in question for a reason other than conducting a drug transaction. *Id*.

The portion of the direct examination Anders complains of reads as follows:

Q:     Actually, one little background, how long had you known Jeffrey Resnik?

A:     For a couple of years.

Q:     A couple of years. Okay. And that was through drug deals?

A:     No. It was just a friend at first.

Q:     Okay. There were drug deals between you and he, though?

15

A:      Yes.

Q:      Okay.  And you -- so you meeting him as a friend was not odd on the 11th?

A:      Say that again?

Q:      Would you have occasion to meet Jeffrey Resnik for something that didn't have to do with drugs?

A:      Oh, yes.

Trial Tr. at 160-61.

Putting this question in context demonstrates that this was not a prejudicial question.  The very next line of testimony by Anders established that Anders had previously purchased marijuana from the CI, and he had been recently trying to put the CI in contact with his cousin for his cousin to purchase marijuana.  *Id*. at 161-62.  The prejudice of trial counsel suggesting in a question that their relationship was drug-related and not social is undermined by the fact that Anders thereafter testified that the CI had been supplying Anders marijuana and he was arranging for his cousin to purchase more.  The prejudice is further undermined by all the other evidence that demonstrated the CI's and Anders's relationship was in part related to drugs.  The CI had previously testified that he had known Anders approximately two to three years, and that he had met Anders through a mutual friend.  *Id*. at 92.  The CI also testified that he had met Anders in the context of obtaining drugs.  *Id*.

The CI also testified that he had used marijuana with Anders on occasion and bought methamphetamine from Anders.  *Id*. at 93.  The CI had testified that he had obtained a source for methamphetamine on the "dark web" and, after Anders was

16

released from jail on his first federal methamphetamine case, the CI began selling methamphetamine and marijuana to Anders. *Id*. at 95-96. The CI testified that since Anders had been released from jail, he had sold him 28 grams of methamphetamine "probably upwards of 30 times." *Id*. at 102-103.

Before Anders testified, the jury had heard Anders's confession that he had been "fronted" the simulated methamphetamine by the CI, and that Anders had gotten an ounce of methamphetamine from the CI three times in the preceding three months. Trial Tr. at 182. The issue of Anders's drug activity had already been raised before the jury- including in Anders's own recorded words-and needed to be addressed as part of Anders's defense. As such, counsel's question about whether Anders had known the CI through drug deals was strategic and would not have shocked the jurors at all.

Although counsel stated that in hindsight the question could have been phrased better, *see* Doc. 10, Exhibit A, the question provided Anders an opportunity to deny the CI's testimony that they had met in in the context of drug dealing. Trial Tr. at 160. Counsel followed up by questioning Anders about his relationship with the CI, emphasizing that they were friends, and that Anders had met with the CI for reasons that were unrelated to their drug activities. *Id*. Given the facts of the case, this was consistent with Anders's stated defense as well as strategically sound. It is well established that a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, at 6669. Additionally, the court "must avoid second-guessing trial strategy." *Sanders v. Trickey*, 875 F.2d 205, 207 (8th Cir. 1989).

17

Even if counsel's question about how Anders had met the informant had been in some way deficient, given Anders's answer as well as Anders's subsequent line of testimony, Anders was simply not prejudiced.  Finally, the evidence of Anders's guilt was overwhelming, and had counsel phrased that question in a different manner, it could not have possibly made a difference in the outcome of the trial.

### C.  **The issue of ineffective assistance of counsel respecting counsel's strategic decision not to show the video clip in question has been raised and resolved.**

In his third ground for relief, Anders asserts that his attorney "was ineffective for not showing the entirety of the surveillance video, which provided mitigating evidence." Doc. 1 at 14.  By mitigating evidence, Anders apparently means that the recording showed no evidence of illegal activity, stating that "[t]he video does not show an exchange of drugs between the Movant and confidential informant.  Nor does the audio recording reveal discussion of a drug transaction." *Id*. at 15.  This issue was raised by Anders at sentencing, evidence was presented, and the Court found that there was "absolutely no prejudice" and "absolutely no ineffective assistance of counsel on this point."  Sent. Tr. II at 25.

Anders does not present any evidence in this respect, much less new evidence that was not available to him at the time of the original hearing on this issue.  The record is clear that the video did not capture the drugs changing hands simply because that is not what happened.  The police put the simulated drugs in a plastic baggie and concealed it in a Styrofoam cup which was given to the CI.  The CI was filmed walking to Anders's vehicle with the cup containing the simulated drugs.  The

18

hidden camera video, where the CI was seated facing forward in the car, is not surprisingly just the windscreen and dashboard.  Trial Tr. at 106.  The CI simply left the cup in the vehicle and then left without it after the conversation was over.

Moments after the CI left Anders's vehicle, Anders was pulled over by uniformed officers and the bag of simulated drugs was found concealed in his sock. The jury rationally concluded from all these facts that Anders had just knowingly attempted a drug deal with the CI.  The jury was shown the pertinent parts of the recordings, which Anders claims "showed no evidence of illegal activity."  The argument that his attorney was ineffective for not showing other parts of the video that showed nothing is simply without merit, as this Court previously found.

In April 2021, after having heard all the evidence at trial and having heard trial counsel testify at the sentencing hearing, this Court made the following findings:

> Okay. Well, first of all, it is absolutely clear to the Court that this was nothing but a strategic decision by defense counsel not to show any more of the video, which would have shown nothing more than what was produced.
>
> Not only that, there is absolutely no prejudice because of this. And there was all sorts of other evidence that came out in this trial that showed that the - the evidence against the Defendant was overwhelming, and this particular strategic call not to show any more of the video inside the car because it was -- didn't show anything more that it's just -- for one thing it's not even relevant it seems to the Court. And, in any event, there's absolutely no prejudice.
>
> So with that, again, the objections to the presentence report are overrruled. And I make express findings about there is -- about the performance of Mr. Skrien, and there's absolutely no ineffective

assistance of counsel on this point.

Sent. Tr. II at 25.

Based on the record in this case, the trial evidence, and the testimony of trial counsel, the Court will reaffirm its prior holdings that: 1) the decision to play or not to play the video was a strategy decision entrusted to counsel; (2) there was no prejudice in failing to show the remainder of the CI video; (3) the evidence was overwhelming, and therefore any arguable prejudice would have been harmless.

**D.  Anders was not prejudiced by the trial being completed in one day.**

In his final ground for relief, Anders claims that he was prejudiced "by the desire of the parties to complete the trial in one day."  Doc. 1 at 15.  Anders indicates that, because the case was submitted to the jury at the end of the day, "[t]here existed ample incentive for the jury to reach a swift decision and be done with their duty and not have to return another day."  *Id*.  Anders submits that this "rush to judgement" was prejudicial to him.  Anders fails to identify exactly how submitting the case to the jury at the end of the day was in fact prejudicial to him.  There is absolutely no evidence to support this claim, merely Anders's speculation that he was prejudiced by a quick verdict.

The record reflects that there was nothing improper in the jury's decision-making process. This was a factually straightforward case with Anders charged in a one-count indictment with attempting to possess with the intent to distribute methamphetamine. The jury instructions were clear, and the jury never submitted any questions to the Court during deliberations.

As part of the jury instructions, the jurors were told that "[t]he law demands of you

20

a just verdict unaffected by anything except the evidence, your common sense, and the law as I give it to you." Trial Tr. at 195; Second Case, Doc. 49 at 2. The jury was instructed that Anders was presumed to be innocent, and that the presumption of innocence could only be overcome if the government proved each element of the crime beyond a reasonable doubt. Trial Tr. at 200; Second Case, Doc. 49 at 7. The jury was also instructed that they were to make a conscientious decision only after considering all of the evidence, discussing it with the other jurors, and listening to the views of the other jurors. Trial Tr. at 203; Second Case, Doc. 49 at 12. Finally, they were instructed that they were not to come to a decision "simply to reach a verdict." *Id*. It is axiomatic that a jury is presumed to follow its instructions. *Weeks v. Angelone*, 120 S.Ct. 727, 733 (2000). Anders presents no evidence to the contrary.

The record also clearly reflects that the evidence of Anders's guilt was overwhelming. Anders was caught leaving the controlled delivery with a one-ounce bag of simulated methamphetamine in his sock, and the jurors heard from Anders's supplier about their ongoing drug business. Finally, the jury heard Anders's recorded confession explaining that he had received the simulated methamphetamine on the "front" and that he had received three ounces from the CI over the past three months. Anders's story that he wasn't there to do a drug deal, and that he was talking about old marijuana deals during his post arrest interview simply did not hold water. In short, the jury returned a quick verdict simply because there was not much to discuss in the case.

## VI.    CONCLUSION

For the foregoing reasons, this Court will deny Anders's § 2255 motion [Doc. 1] without an evidentiary hearing.

**IT IS FURTHER ORDERED** this Court will not issue a certificate of appealability because Anders has not made a substantial showing of the denial of federal constitutional right.

**SO ORDERED** this 28th day of May, 2025.

STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE